28889. PAYNE v. THE STATE.

HALL, Justice.

Thomas Robert Payne, Jr., appeals his conviction of

rape and aggravated sodomy. The modus operandi of the attack and the victim's opportunity to identify Payne became issues at the trial.

Between 2:00 and 3:00 a.m. on Sunday morning, March 26, 1972, the victim, a white woman, left her job and drove alone to her home in Cobb County. At some point along the way she noticed that a car was following her but she dismissed the fact thinking it might have been a neighbor. The car followed her all the way home. The evening was foggy; there were no street lights in her neighborhood; there was a yellow light burning over her carport and one light burning inside her house. At her home, before she emerged from her automobile, she saw a black man looking in her car window. He then opened the door, grabbed her and threw a coat over her head. The victim was forced into the back yard and raped. She then was "pushed" around her house, the assailant staying behind her the whole time, to another corner of the house where the second offense took place. She was then pushed toward his car, the engine of which she could hear running, but she screamed and he ran. She sought refuge in a neighbor's home, and police were notified.

Though the details of her identification of her assailant will be more thoroughly discussed below, basically she said he was a tall black man of medium build. At this time there was no reason to suspect Payne, a noted basketball player, and the large group of photos which the police asked the victim to review did not include Payne. She identified no one on that occasion. Some days later, on April 16, 1972, another white woman reported to police that she had been accosted by a tall black man under very similar circumstances in the early morning hours, and that she had foiled his attack and chased him back to the automobile in which he had followed her home, noting his license number. The car was registered to Payne. Subsequently, in investigating the instant crime and other rapes and assaults in the general area, police showed the prosecutrix and other victims either a live or photographic lineup, or both, in which Payne was present. The prosecutrix here identified Payne as very like her attacker each time he or his photo was present in the group she viewed. Other women also

identified Payne as having similarly accosted them.

Payne was indicted on November 20, 1972, and was tried on June 28 and 29, 1973, by a jury which found him guilty. On this appeal he raises ten enumerations of error.

I. The Pre-Trial Discovery Motion.

Payne first enumerates error in the superior court's denial of his pre-trial discovery motion. The "Motion for Discovery and Inspection, Issuance of Subpoena Duces Tecum and Production of Evidence Favorable to the Accused" sought 23 enumerated classes of information from the prosecution's files, and Payne's attorney argued before trial that the files should be produced for his personal inspection. The trial judge refused the request for personal inspection, but made an in camera inspection of all the material in the state's file and then passed an order stating that the file contained no information or evidence favorable to the accused; that 13 of the requested types of information had already been furnished Payne; that the motion was overruled with respect to the remaining items because a contrary decision would compel the prosecutor to open his files to the accused contrary to *White v. State,* 230 Ga. 327 (196 SE2d 849).

Payne argues that his motion was grounded in Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215); Giles v. Maryland, 386 U. S. 66 (87 SC 793, 19 LE2d 737); Williams v. Dutton, 400 F2d 797 (5th Cir. 1968); and United States v. Eley, 335 FSupp. 353 (ND Ga. 1972); and that this court's decisions in *White,* supra, and *Walker v. State,* 215 Ga. 128 (109 SE2d 748) are in conflict with federal precedent.

It is unnecessary herein to consider whether there is conflict, because it is irrelevant to the decision of this appeal. The in camera inspection which was made by the trial court comports with the procedures suggested by the federal cases Payne cites. The conduct of an in camera inspection, and the trial court's ruling that there was nothing in the file favorable to the accused, satisfies the requirements of Brady, supra, in which it was held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U. S. p. 87. The federal courts recognize no right in a defendant to peruse the state's file personally. See Williams v. Dutton, supra, 400 F2d, p. 800. We also note that at no time has Payne pointed even vaguely or generally to any item of information or class of information in the state's file which might conceivably have been favorable to him. Under these circumstances, there is no merit in this enumeration of error. *Hicks v. State*, 232 Ga. 393 (207 SE2d 30); Williams v. Dutton, 431 F2d 70 (5th Cir. 1970).

## II. The Pre-Trial and In-Court Identification Procedures.

Payne's enumerations 2 and 9 complain that certain pre-trial identification procedures violated his due process and equal protection rights, and that the trial court erred in refusing on his motion to strike the victim's in-court identification which was grounded in these impermissibly suggestive procedures.

The record reveals that the police utilized four pre-trial identification procedures in attempting to identify the rapist. At some time between March 31 and April 16, the victim was shown photographs of between 250 and 300 black males. Payne was not in the group, and the victim made no identification. On April 20 (following the April 16 identification of Payne as the owner of the automobile in which a tall black man followed another white woman and then accosted her) she was shown a display of photographs of seven black males. After approximately 60 seconds she picked up numbers three and seven, put three down and said that seven "resembled him a bit." Number seven was Payne. On May 22, the Atlanta police conducted a lineup in which Payne participated. Upon the recommendation of his counsel, who was present at the lineup, a method was employed to disguise Payne's height of seven feet two inches. All men participating, eight black men, were seated behind a table, with a blanket covering the front of the table to hide their legs, and all save Payne were raised by seating them on telephone books, so that Payne and one other man appeared to be the two shortest of the

group, though all head heights were approximately the same. The victim and numerous other women who had been recently subjected to rapes or attempted rapes viewed the lineup. The victim, after looking through the viewing window for one or two minutes, said "Two of them look like him, the first one and the second one." Payne was the second man. On October 7, the victim was shown a photographic display of eight black men including previously unused photographs of Payne. A front view and profile view of each man were shown. The detective in charge testified that this test was made to see if the victim was still able to identify the rapist seven months after the attack. By insert in the photograph, or by a placard around the subject's neck, each full face photograph bore a sign at the bottom. For six men, including Payne, the man's height and weight appeared in small script at the bottom of the sign. Two men were shown standing before a lined chart which presumably showed height. The signs of two men were labeled "Identification Bureau, Cobb County, Ga." The other six, including Payne, bore an Atlanta label. She positively identified Payne after viewing the sixteen photographs for from 60 to 90 seconds.

Payne argues that the victim's identifications of him were not credible because she had never given a description of the rapist which actually fit Payne. The record shows that there were a few possible discrepancies in the descriptions given by the victim at various times, but they were not crucial. Her neighbor's testimony was that after the attack she was hysterical, and her first description was given shortly thereafter to Cobb County police. The police report of her statement showed she described him as a black male, six feet two with medium build and dark toned skin, clean shaven, having short hair, rotten teeth and a stutter. Payne is a black male, seven feet two inches tall, with dark toned skin, and apparently at all times has had healthy teeth. One detective testified that she told him that her initial statement to the Cobb County police was that the rapist was seven feet tall, but they thought she was exaggerating and encouraged her to reconsider. She testified she never saw him standing and was unsure of

his height except that he was tall. With reference to his teeth, the victim testified that she had never stated they were rotten, but had said they appeared to have a defect. She could not remember whether she had said he stuttered. Payne urges that no testimony was given that he actually stuttered; however, the following sentence appears at the mid-point of his unsworn statement, which ran 15 pages in transcript form: "I've tried all my life to do — do — do — do— do — the right thing." In light of the fact that Payne was not arrested until almost two months after the attack, any possible issue of whether the assailant was scratched in the struggle, as the victim might have reported, becomes moot. There is no substance to Payne's assertion that his physical characteristics eliminate him as the rapist.

Payne's argument addressed to the lineup procedures is that due process required the exclusion of the victim's in-court identification of him because the October 7 photographic display was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," which was the test enunciated in Simmons v. United States, 390 U. S. 377 (88 SC 967, LE2d 1247) for setting aside a conviction "based on eyewitness identification at trial following a pretrial identification by photograph . . ." 390 U. S. at 384. Accord, *Moye v. State,* 122 Ga. App. 14 (176 SE2d 180). The suggestiveness is claimed to have arisen from the fact that only two of the eight men, including Payne, were over six feet tall, when the victim had described the assailant as six feet one or two.

Each case must be considered on its own facts (Simmons, supra, 390 U. S. p. 384), and the due process test looks to the totality of the surrounding circumstances. Id. p. 383; Neil v. Biggers, 409 U. S. 188, 199 (93 SC 375, 34 LE2d 401); *Yancey v. State,* 232 Ga. 167 (205 SE2d 282). Simmons enunciated a two-part test. The first inquiry is whether the photographic display was impermissibly suggestive. Only if it was, need the court consider the second question: whether there was a very substantial likelihood of irreparable misidentification. "[I]f the judge does not find as a matter of law both that the picture spread was impermissibly suggestive *and* that there is a

substantial likelihood of irreparable misidentification, the in-court identification may be put before the jury." United States v. Sutherland, 428 F2d 1152, 1155 (5th Cir. 1970) (emphasis in original). Cf. Ward v. Wainwright, 450 F2d 409 (5th Cir. 1971) (involving a show-up, rather than photographic display).

Even assuming that the victim noted the height for each man in the one or one and a half minutes during which she viewed the sixteen photographs, the fact that Payne was one of only two men over six feet tall did not make the eight-man display impermissibly suggestive. The display might have been more nearly perfect had a larger percentage of the men been taller; but this is not the quality of suggestiveness which invalidated pre-trial identifications in, for example, Foster v. California, 394 U. S. 440 (89 SC 1127, 22 LE2d 402), *Baier v. State,* 124 Ga. App. 334 (183 SE2d 622), and Ward v. Wainwright, supra. In Foster, the defendant was one of only three men in a lineup; he was five or six inches taller than the other two, and he wore a jacket similar to one the robber had worn. In *Baier,* two out of three photographs exhibited to the victim were of defendant, and one of the two had a mustache drawn on it. In Ward, defendant alone was shown to the victim who was told that he had refused to participate in the lineup and that he was being held on a charge of breaking and entering another person's premises in the victim's building. By contrast to those cases, here the other seven men were six feet four inches, five feet eleven inches, five feet ten inches, five feet seven inches, five feet six inches, and two were five feet nine inches. Here, no man was the six feet one or two inches the police report indicated the victim had first estimated, but five men were within four inches of that height, above or below it—and none of those five was Payne.

Because we have ruled that this photographic display was not impermissibly suggestive, we need not consider the second portion of the test, to determine whether suggestiveness has contributed to misidentification. Therefore, the decision in *Butler v. State,* 226 Ga. 56 (172 SE2d 399), cited by Payne, and those in *Griffin v. State,* 229 Ga. 165 (190 SE2d 61), and *Baier v. State,* 124 Ga. App. 334, supra, are inapplicable

because they concerned the fashion in which the effects of an invalid or "tainted" lineup might be sufficiently purged to allow an in-court identification. We have here no initial taint, and the trial court did not err in refusing to suppress the in-court identification on this ground.

We need not dwell long on Payne's attack on the May 22 lineup, with respect to which his argument is basically unfair to the record. The May 22 lineup is claimed to have prejudiced him in two respects: that there was no reason to include Payne; and that seating the other participants on items to make them seem nearer his height deprived him of his most outstanding physical characteristic, his height of seven feet two inches. With reference to whether there was reason to include him in the May lineup, on April 20, a month before the lineup, Payne had been identified by the victim as possibly the rapist. On April 16, more than a month before the lineup, another woman had identified a car registered to Payne as that driven by her assailant who employed a similar modus operandi. Prior to this lineup, Atlanta had had three rapes employing the same modus operandi used in the instant rape which took place in Cobb County, near Atlanta. Payne's argument essentially is that the fact that he was a tall black male as described by the victim, together with the fact that the victim described a modus operandi also used in Atlanta and tentatively attributed to Payne, was inadequate reason for placing him in the Atlanta lineup. This contention is frivolous. To the extent to which Payne argues that it was improper for the Atlanta police to assist in the investigation of a Cobb County rape and for a suspected Cobb County rapist to be exhibited in an Atlanta police lineup, the argument is totally without merit.

Equalizing the heights of the men in the lineup by having the shorter ones sit on objects to raise them, was done at the recommendation of Payne's attorney. The police witness testified that the police would probably have wanted to use that procedure in any event; but Payne may not now object, on grounds that it disguised his height, to a procedure his attorney recommended for the specific purpose of disguising his height.

Moreover, the record reflects that the police felt unable to produce other men seven feet tall for the lineup, though perhaps they did not exhaust their possibilities for doing so; that Payne's attorney told them he would bring other Atlanta Hawks basketball players for the lineup (Payne played on that team); that he later told them he would be unable to do so because the players refused to participate; that when the lineup began the police brought in the men and Payne's attorney arranged them; that Payne's attorney changed the lineup three times and then expressed satisfaction with it; that after the lineup had been photographed and the witnesses began the viewing, they identified Payne with regularity; that his attorney then attempted to change the procedure on grounds that someone must be telling the witnesses which man to identify; that Payne's chief counsel had with him a second attorney and also the attorney for the Hawks; that he was offered the opportunity to remain in the viewing room, to station one fellow attorney with the waiting witnesses, and to have the other accompany the detective and each witness to the viewing room; that he did not avail himself of this offer but threatened to take Payne out of the lineup and was told he had no legal authority to do that. The lineup then continued.

The totality of the surrounding circumstances shows that the lineup was not impermissibly suggestive but was fairly conducted, and was performed in accordance with the suggestions of Payne's attorney. This enumeration is without merit. No error appearing in the pre-trial identification procedures employed, the trial court did not err in allowing the victim to give an in-court identification of Payne as the rapist, and there was no primary taint in this identification to be purged.

III. The Allegations of Grand and Petit Jury Discrimination.

Payne alleges that at the hearing of his plea in abatement he proved a prima facie case of racial discrimination in the composition of the Cobb County grand and traverse juries. He alleges that the names of prospective jurors were taken exclusively from the rolls of registered voters; that during the year 1972, when he was indicted, "Blacks constituted less than 1.3 percent

of the total numbers of grand jurors"; and that he "produced evidence to show Blacks rarely if ever serve on traverse juries in Cobb County." Our examination of the hundreds of pages of oral and documentary evidence introduced on these issues leads us to conclude that the record will not support these assertions and that no jury discrimination appears.

Payne was indicted at the November, 1972 term, and was tried in June, 1973.

The evidence showed that in January 1972, there were 68,000 registered voters in Cobb County. The list of registered voters was the initial source for juror names, but lists were periodically furnished to the six jury commissioners for them to delete persons known to them to have moved or died, and to add whatever names they wished. The registered voter list was updated by computer about 75 times per year, adding newly registered voters and deleting those dead or moved. In early 1972 the designation of race was removed from all new cards prepared as voters registered, but old cards for continually active voters who had not been required to re-register bore a designation of race. However, these cards were merely input into the computer system which handled the jury selection, and in transferring data from card to tape, race data was ignored and did not enter into the tape system. The tape system was entirely color-blind. Neither the clerk of court nor any of the jury commissioners knew or guessed how many blacks were on the jury source lists on tape. On tape, records were arranged alphabetically by last name within voting precinct, and this became a prospective juror's record. When it was desired to select a jury, names were chosen from the tape at a fixed interval, for example, each tenth name. The interval number was chosen so that the entire list could be used to produce the final desired number of names. Those names became the petit jury venire and, for example, each tenth one of the petit jury venire names was chosen for the grand jury venire. Apparently the names were put into a box in paper form. For each of the six grand juries required for each year, cards were drawn "in lottery fashion" in open court from the compartment of the box containing names not used already that year.

Forty names were drawn for the grand jury; the order in which it was drawn was noted for each; when the persons on the grand jury venire appeared in court the first 23 who were drawn and who appeared became the grand jury unless they were individually excused, and the remaining 17 or fewer were put over to be called first at the next term. Trial jurors were drawn in the same manner and were arranged into four panels of 12 each in the order in which drawn, skipping those who failed to appear.

The commissioners, in their work, were instructed to try to achieve a true cross section of the population. The list used for 1972 was revised by the jury commissioners in 1971. One commissioner who participated in that revision, Mr. Ferguson, was black. He testified that he felt he should eliminate those under 21 and over 65. In 1971 he added no names, though in later revisions he had. He had issued information to Negro churches to approach him if members desired to be added to the list, and he thought he was well known in the community, but he got a poor response from prospective black jurors. Anytime he added names he looked later to insure their addition. They always appeared. He testified, concerning whether the list fairly reflected his predominantly black community, "I was quite surprised to know that through the reference running in the cross section of it to find a vast number of the people that I knew in my immediate area were on this list."

From the total list of 40 grand jurors in Payne's venire, Mr. Ferguson recognized two persons on the list as blacks, to his personal knowledge. Mr. Ferguson was satisfied that blacks were fairly represented in the cross section; no one ever deleted a juror's name he felt should be on the list; and in answer to the court's questions of what might be done to encourage more blacks to serve, he could suggest only that jurors be paid more, since many blacks disliked spending time away from their jobs when jurors were paid only $10 per day.

No purpose would be served by detailing the testimony of the other five jury commissioners. One commissioner testified that he had added no blacks to the

list, but the other five testified that they had either added names of blacks, or attempted to do so and had been foiled by the refusal of the blacks to serve. Numerous commissioners testified to the problem Mr. Ferguson had encountered—the unwillingness of many blacks to lose time from their jobs or businesses to engage in jury duty.

Payne attempted to introduce two figures from the files of a private group, the Voter Education Project, tending to show that 2,000 or 2,500 blacks were registered to vote in the county; but the court, after ascertaining that these figures rested merely on conjecture or on the guesswork of political activity groups and not on the personal knowledge or opinion of any identifiable individual, refused to admit the documents. Therefore, these figures are not evidence.

Payne called as his witness a black, Mr. Grogan, who was affiliated with the NAACP and who had worked in voter registration drives among blacks. Mr. Grogan testified that the black population of Cobb County was "3 to 6%"; that when he had seen full traverse jury venires of 48 people there were one or two blacks on the venires each time; that he had seen blacks serving on petit juries when he looked to check, as he sometimes did. However, his testimony is not sufficiently clear to indicate how often he saw blacks actually sitting on trial juries. Mr. Grogan himself had been called for jury duty and had asked to be excused, though he indicated a willingness to serve at a later date. He testified that his estimate was that only 800 to 1,000 blacks were registered to vote, and that the low number was traceable to "apathy."

The Cobb County jury selection system had been used, at the request of the United States District Court for the Northern District of Georgia, to draw jurors for that court on two occasions, beginning in January, 1971.

To turn to our analysis of the record, census figures for Cobb County in 1970 showed that there were in the population 188,160 whites, and 8,180 blacks. Blacks constituted a little under 4.3% of the general population, though, as will be shown below, they constituted a smaller percentage of the registered voters. This shifts our inquiry to the point of voter registration: is there in this record anything that indicates that voter reg-

istration as a source for jury members discriminates against blacks? We must answer this question "no." All may vote who qualify by age and residence within the area. Mr. Grogan testified that he found potential black voters were led by "apathy" not to register; but that after he talked to them, presumably on registration drives, he found they tended to register in greater numbers. Nothing in this record shows racial discrimination in voter registration. Absent more, the mere use of a source list in which blacks are less well represented than whites, if the lower representation does not flow from racial discrimination, is not itself racially discriminatory. Brown v. Allen, 344 U. S. 443, 473 (73 SC 397, 97 LE 469) (tax digest). Having established the validity of the major source of juror names, we proceed to inquire into these percentages as they sift through the juror selection system.

One problem with Payne's case on this point was his inability to establish the percentage of registered black voters. If, for the sake of mathematical investigation, we take a figure Payne attempted without success to introduce, that is, that there are 2,000 blacks registered to vote in a total of 68,000 registered voters in Cobb County in January, 1972, then blacks would constitute a little less than 3% of the registered voters. Careful examination of Payne's exhibit of the 157 voter registration cards of the 1972 grand jury venire shows that though perhaps the majority contain no racial designation, there are nonetheless three identified as blacks. (As will be detailed below, the evidence showed there were two additional blacks as well.) Using only those three, and leaving out of our computation the vast number of persons of unidentified race, we find that in excess of 1.9% of the 1972 grand jury venire were definitely blacks out of a potential source (registered voters) of, hypothetically, 3%.

If, on the other hand, we ignore the inadmissible evidence and use the only valid information the record appears to contain on the number of registered black voters, that is, the testimony of Mr. Grogan, Payne's witness, we have his estimate that only 800 to 1,000 blacks were registered in Cobb County. That would mean

that (using 1,000) only somewhat less than 1.5% of the registered voters were black; but our figure above shows somewhat more than 1.9% of the racially identifiable grand jurors were black, even assuming that none of the racially unidentifiable jurors were black.

Additionally, we have Mr. Ferguson's testimony that two persons in the November 1972 jury venire were known to him to be blacks, though they did not serve because they were not among the first 23 drawn. The exhibit of the 157 voter registration cards referred to above does not contain the cards for the excess 17 venire members for November, presumably because they were put over to 1973. If we add these 17 to the others drawn for 1972 however, to get the total figure drawn for 1972, we have 174 persons, with five definitely identified as black. The percentage of blacks on the total 1972 grand jury venire would then be 2.87%.

Thus, our figures work out to the following progression of percentages: 4.3% blacks in the county population; perhaps 1.5% or perhaps 3% blacks on the voter roll; at *least* 2.87% blacks on the total 1972 grand jury venire (and this disregards entirely the vast number of persons whose race is unascertainable, many of whom may be blacks); at least two out of 40, or 5% blacks on the actual venire from which Payne's grand jury came; no blacks on the actual grand jury that indicted him; no evidence on the petit jury venire but allegedly no blacks on the actual petit jury that convicted him.

The procedures for culling the jury were racially neutral. The Georgia constitutional and statutory system for jury selection is not inherently unfair, Turner v. Fouche, 396 U. S. 346 (90 SC 532, 24 LE2d 567); there is no evidence of unconstitutional manipulation of the lists to eliminate blacks as there was in Turner v. Fouche, supra. This evidence is quite different from the gross percentage disparities present in *Gould v. State,* 131 Ga. App. 811 (207 SE2d 519); and does not present the combination of an obvious opportunity for racial discrimination coupled with a steadily dropping percentage of blacks, which was condemned in Alexander v. Louisiana, 405 U. S. 625 (92 SC 1221, 31 LE2d 536) and Whitus v. Georgia, 385 U. S. 545 (87 SC 643, 17 LE2d 599).

The system is comparable to the color-blind system approved by this court in *Miller v. State,* 224 Ga. 627 (163 SE2d 730), and is more carefully monitored to assure a community cross section than that approved by the United States Supreme Court in Swain v. Alabama, 380 U. S. 202 (85 SC 824, 13 LE2d 759). Against this background, and considering the evidence that despite their small percentage in the population blacks were frequently present on venires and juries, the fact (if it was a fact) that there were no blacks present on the actual petit jury that convicted Payne is constitutionally meaningless. Swain v. Alabama, supra; Frazier v. United States, 335 U. S. 497, 507 (69 SC 201, 93 LE 187); *White v. State,* 230 Ga. 327, 332 (196 SE2d 849).

Having failed to meet the two requirements of *Pass v. Caldwell,* 231 Ga. 192 (200 SE2d 720), Payne has failed to make out a prima facie case of racial discrimination on his grand and petit juries.

Payne's second attack on the Cobb County jury selection procedure argues that as a young man of 22 he suffered from the unconstitutional underrepresentation of young people between the ages of 18 and 30. Payne argues that persons under 30 constitute 35.7% of the Cobb County population, but only 28.7% of the 1972 grand jurors; 13% of the November 1972 grand jurors; 29.2% of the 1973 traverse jury list; and 24.5% of the petit jury venire from which his petit jury came. A review of the record shows that no age discrimination appears in the selection procedure.

This contention is without merit because we have recently ruled in answer to a similar contention that "it is extremely doubtful that any age group has such a distinctness as a group that it can be a 'significantly identifiable group' under the provisions of Code Ann. § 59-106 which requires the jury commissioners to supplement the lists with persons from such a group if it is not fairly represented otherwise." *State v. Gould,* 232 Ga. 844, 845. It is not necessary here for us to rule that persons of the age group 18 to 30 cannot ever be a constitutionally cognizable group for purposes of jury selection, because, even assuming without deciding that Payne's percentages are correct, a mere un-

derrepresentation of young persons no more aggravated than his figures show, is not adequate to threaten any constitutional deprivation to a criminal defendant. Young persons, though they certainly belong in the cross section, do not make up a constitutionally highly protected class, that is, one which has suffered oppression and discrimination; and their claimed underrepresentation does not evoke a high standard of judicial review.

IV. The Charge on Presumption of Innocence.

Payne enumerates as error the court's charge on the presumption of innocence, which was: "Every person is presumed innocent until proved guilty. No person shall be convicted of a crime unless each element of such crime is proved beyond a reasonable doubt." Payne argues that the charge was not correctly and fully given because it failed to convey the meaning and function of the presumption, did not delineate its essential functions, and left to the jury's speculation the question how to apply it.

Payne's argument is pitched primarily on language from *Brock v. State,* 91 Ga. App. 141, 142 (85 SE2d 177) which recites that the presumption of innocence constitutes an instrument of proof in defendant's behalf, and which, drawing from *Reddick v. State,* 11 Ga. App. 150 (74 SE 901), further states that the jury must be charged "substantially to the effect" that the presumption remains with defendant throughout the trial and until his guilt is established by proof. The *Reddick* case did, in headnote fashion, state the general proposition for which *Brock* cited it, which is the same for which it was cited in *Gardner v. State,* 17 Ga. App. 410 (87 SE 150) and *Thurman v. State,* 14 Ga. App. 543 (6) (81 SE 796). However, *Reddick* required no special language, and therefore the question becomes, what is "substantially to the effect" required by *Reddick?* The *Brock* court answered that question by approving, as "substantially meet[ing] these requirements" a charge which, as paraphrased in the reported decision, said nothing of the presumption as an instrument of proof nor of its "remaining" with defendant, but charged "in effect that the defendant is presumed in law to be innocent until and

unless the evidence satisfies the minds and consciences of the jury beyond a reasonable doubt of his guilt and that, if they do not believe he is guilty beyond a reasonable doubt of the offense charged, it is their duty to acquit . . ." 91 Ga. App. 141. The charge Payne's jury received contains all the elements present in the *Brock* charge.

Additionally, *Hayes v. State,* 18 Ga. App. 68 (4) (88 SE 752) ruled that "in the absence of an appropriate request for more specific instruction, an excerpt from the charge of the court, in which the jury were told that the defendant was presumed to be innocent, and that the burden was upon the State to establish his guilt to a moral and reasonable certainty and beyond a reasonable doubt, was not subject to exception merely because the judge omitted to state to the jury that the presumption of innocence remained with the defendant until overcome by proof." Accord, *Carter v. State,* 71 Ga. App. 626, 628 (31 SE2d 666). Charges closely comparable to the charge given here have been upheld by this court and the Court of Appeals. E.g., *Wise v. State,* 209 Ga. 115 (70 SE2d 598); *Morris v. State,* 97 Ga. App. 762 (104 SE2d 483). The charge given tracked the language of Code Ann. § 26-501 concerning the presumption of innocence. The record does not reflect that Payne requested any further or more detailed instruction on the presumption of innocence, and in the absence of any such request, the charge given was not insufficient, and Payne was not by this charge deprived of a fair trial.

V. The Charge on Reasonable Doubt.

Payne argues that his due process and equal protection rights were violated by the following charge on reasonable doubt: "The burden of proof rests upon the State to prove each element of the offense charged beyond a reasonable doubt. The State, however, is not required to prove the guilt of the defendant beyond all doubt. Moral and reasonable certainty is all that can be expected in a legal investigation. A reasonable doubt means just what it says. It is a doubt of a fair-minded, impartial juror honestly seeking the truth, not an arbitrary or capricious doubt. But it is a doubt arising from a consideration of the evidence, from a lack of

evidence, from a conflict in the evidence, or from the statement of the defendant.

"If after giving consideration to all of the facts and circumstances of this case, giving the defendant's statement such weight and credit as you think it is entitled to receive, your minds are wavering, unsettled and unsatisfied, then that is the doubt of the law, and you should acquit. But if that doubt does not exist in your minds as to the guilt of the defendant, then you should convict."

The charge is alleged to be erroneous because it did not define "reasonable doubt"; because it did not define "reasonable doubt" in specific terms as a doubt for which a reason may be given; and because it allegedly left the jury free to convict if their minds were wavering, unsettled and unsatisfied. The third allegation plainly misreads the charge and is frivolous. Neither is there any merit in the first two objections. "Reasonable doubt" has often been held by our courts to be a self-explanatory term readily understandable by the average juror for which no further definition need be given in the absence of a request — and there was no request here. *Spurlin v. State,* 222 Ga. 179, 182 (149 SE2d 315); *Hammond v. State,* 212 Ga. 186 (91 SE2d 615); *Campbell v. State,* 144 Ga. 224 (87 SE 277); *Elder v. State,* 143 Ga. 383 (85 SE 197); *Nelms v. State,* 123 Ga. 575, 578 (51 SE 588); *Battle v. State,* 103 Ga. 53 (29 SE 491); *Lingo v. State,* 96 Ga. App. 379 (100 SE2d 116); *Swain v. State,* 91 Ga. App. 561 (86 SE2d 642); *McDowell v. State,* 78 Ga. App. 116, 125 (50 SE2d 633). Though *Bonner v. State,* 152 Ga. 214 (109 SE 291) cited by Payne, did approve a charge including an instruction that reasonable doubt means a doubt founded upon reason, it does not follow that this specific instruction is necessarily part of every valid charge. Indeed, it is not. In *Cash v. State,* 222 Ga. 55 (148 SE2d 420) and *Sheffield v. State,* 188 Ga. 1 (2 SE2d 657) this court has approved charges very similar to those given Payne's jury; and neither charge contained the language present in *Bonner.* The charge was not erroneous.

## VI. The Evidence and Charge on Similar Offenses by Defendant.

Payne enumerates as error the introduction at his

trial of testimony of two female witnesses who told of attempted similar attacks upon them by a man whom they positively identified as Payne. He also objects to admission of the corroborating testimony of the sister of one of these two witnesses. The state offered the evidence to prove Payne's identity as the rapist, and a common plan or scheme. Payne argues that those incidents had insufficient common details with the rape for which he was on trial to justify the admission of testimony concerning those occurrences, and this evidence invited the jury to engage in detrimental racial stereotyping.

Generally, evidence of independent crimes is inadmissible unless its relevance to the issues at trial outweighs its prejudicial impact. *Hicks v. State,* 232 Ga. 393, 397 (207 SE2d 30); *Cawthon v. State,* 119 Ga. 395, 410 (46 SE 897). However, "It is well settled by many decisions of this court in rape cases that proof of similar offenses committed by the accused in the same locality, about the same time, and where similar methods were employed by the accused in the commission of such offenses, all as here, is admissible in his trial for the purpose of identifying him as the guilty party and for the purpose of showing motive, plan, scheme, bent of mind, and course of conduct." *Anderson v. State,* 222 Ga. 561 (3) (150 SE2d 638).

Examination of the trial record shows the following points of similarity among the two attempted attacks and the rape of the prosecutrix: each of these women positively identified Payne as the man who raped or accosted her; each of the three incidents occurred during early morning hours of darkness; each incident occurred within the time span from March 26, 1972 through April 16, 1972; each of the incidents was preceded by the victim's being followed by an automobile as she was returning home alone from work in the early morning hours; each of the three completely or partially identified one of Payne's automobiles as that which followed her; each woman was accosted as she left or prepared to leave her automobile to enter her house or apartment; in each incident the man was carrying a jacket or coat over his arm or slung over his shoulder; the same general geographic area — the general environs of the City of

Atlanta — was the scene of each incident; each woman was white and initially reported to police that the assailant was a black of Payne's general description.

The admission of this testimony was not error, but was amply authorized by the following decisions of this court: *Hicks v. State,* 232 Ga. 393, supra; *McNeal v. State,* 228 Ga. 633 (187 SE2d 271); *Gunter v. State,* 223 Ga. 290 (154 SE2d 608); *Moore v. State,* 221 Ga. 636 (146 SE2d 895); *Mosely v. State,* 211 Ga. 611 (87 SE2d 314).

Payne further alleges that the trial court erred in charging the jury on the consideration they should give the evidence of other offenses. The full charge given on evidence of other transactions was as follows: "Ladies and gentlemen, the defendant is on trial for the particular offense charged in this bill of indictment that you will have out for your consideration, and on no other charge or charges. He is not on trial on account of any other alleged offense or offenses, and any evidence in this case with reference to any other alleged offense or offenses, if any, is admitted for the purpose of your consideration solely and only under the provisions of the law that where knowledge, motive, intent, good or bad faith, or identity, or any other matter dependent upon a person's state of mind are involved as material elements in the offense for which he is on trial. [Sic.] Evidence of the defendant's conduct with reference to the same or similar transactions about the same time is admissible for the consideration of the jury insofar only as it might tend to illustrate the defendant's state of mind on the subject involved, if you think it does illustrate it.

"The court does not intimate or express to you any opinion whatsoever as to whether the defendant has had any other transactions at any time similar to the charge for which he is being tried in this bill of indictment, or of his guilt or innocence of the charge contained in this bill of indictment. Whether he has or not committed other or similar offenses, as I have explained to you, is a matter for you to determine. But if you believe that the defendant has had similar transactions, you will bear in mind that in connection with such evidence you are considering it solely with reference to the mental state or intent of the defendant insofar as the same is

applicable or refers to or illustrates the charge embraced in this bill of indictment which you will have out with you for your consideration, and for no other purpose."

Payne argues that error occurred in the court's partial instruction that such evidence should be considered solely with reference to the mental state or intent of the defendant. We agree with Payne that the ultimate question is not so much his state of mind as of his identity — that is, whether Payne was the rapist. But we agree with the state that whether Payne had on other occasions pursued a similar course of conduct showing a similar state of mind was relevant also to the plausibility of the prosecutrix' testimony, including her identification of Payne as the rapist. The state is free to press its proof by degrees, and there was no error in that portion of the trial court's charge objected to here.

Payne additionally argues that the court erred in failing to charge the jury that before the other offenses would be relevant they must find a "logical connection" between the other offenses and the offense charged. We know of no authority which requires that the specific words "logical connection" be used; and the charge taken as a whole clearly imports that the jury must find some logical connection as a prerequisite to considering the other offenses.

The charge given was quite similar to that which this court approved in *Mosely v. State*, 211 Ga. 611, supra, a rape case in which evidence of another rape was introduced. On neither of the points Payne raises was the charge erroneous.

VII. The Charge on Alibi.

On the issue of alibi, Payne's jury were charged in the following terms: "Now, ladies and gentlemen, the defendant has submitted to you his defense of alibi, and in this connection I charge you that alibi, as a defense, involves the impossibility of the accused's presence at the scene of the alleged offense at the time of its commission; and the range of the evidence, in respect to time and place, must be such as reasonably to exclude the possibility of presence.

"The evidence presented to prove alibi, considered alone or with all the other evidence, need only be

sufficient to create a reasonable doubt of the defendant's guilt."

Payne enumerates this charge as error on the grounds that (1) the use of the word "defense" indicated to the jury that Payne had the burden of proving the truth of his alibi rather than the state's carrying the burden of proving his guilt; (2) the charge given was erroneous because the jury were not charged that defendant need merely establish alibi to the reasonable satisfaction of the jury, and Payne's jury "were not told what degree of certitude was required for them to accept the appellant's alibi evidence"; and (3) that the instruction that alibi might be "considered alone or *with all the other evidence*" shifted the burden to Payne and in effect instructed the jury that they could not acquit him even if they found that the state had not proved his presence beyond a reasonable doubt.

We think objection three simply misconstrues the charge given. The jury were plainly told that alibi evidence need only create a reasonable doubt of his guilt in order to authorize them to acquit, and Payne's argument to the contrary is at odds with the plain words charged and with this court's ruling on this same point in *Paschal v. State,* 230 Ga. 859, 860 (199 SE2d 803). Objection 1 is without merit because the use of the word "defense" is drawn from our alibi statute on which the charge was in part patterned: "Alibi, as a defense, involves the impossibility of the accused's presence at the scene of the offense at the time of its commission; and the range of the evidence, in respect to time and place, must be such as reasonably to exclude the possibility of presence." Code § 38-122. The use of the word "defense" is not burden-shifting when the jury are told, as they were here, that a reasonable doubt, whether created by alibi or anything else, is adequate to acquit.

Objection 2 is, in our view, factually incorrect. This court feels that the charge given was *more* favorable to Payne than the charge that defendant must establish alibi to the reasonable satisfaction of the jury. The charge given on alibi was in accord with unanimous decisions of this court in *Payne v. State,* 231 Ga. 755 (204 SE2d 128); *White v. State,* 231 Ga. 290 (201 SE2d 436); *Paschal v.*

*State,* 230 Ga. 859, supra; and *Johnson v. State,* 228 Ga. 860 (188 SE2d 859).

There was no reversible error in the charge on alibi.

Careful consideration of this voluminous record and of Payne's ten enumerations having revealed no reversible error, the judgment will be affirmed.

*Judgment affirmed. All the Justices concur, except Gunter and Jordan, JJ., who concur in the judgment only.*

ARGUED JUNE 12, 1974 — DECIDED NOVEMBER 18, 1974 — REHEARING DENIED DECEMBER 3, 1974.

*Donald P. Edwards, Howard Moore, Jr., John R. Myer,* for appellant.

*George W. Darden, District Attorney, Joseph L. Chambers, Assistant District Attorney, Arthur K. Bolton, Attorney General, John W. Dunsmore, Assistant Attorney General,* for appellee.