**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Gary Duwayne WHITE, Sr., Defendant and Appellant.**

No. 18460.

Supreme Court of South Dakota.

Argued March 22, 1995.

Decided Sept. 27, 1995.

Mark Barnett, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, for plaintiff and appellee.

Vicki L. Tucek, Aberdeen, for defendant and appellant.

KONENKAMP, Justice.

Defendant appeals his convictions for felony murder, burglary, and rape. We affirm.

### FACTS

Antionette "Toni" Deibert, age fifty-six, was found dead in her bedroom at her home in Aberdeen. The cause of death was an acute cerebral hemorrhage resulting from a ruptured "berry" aneurysm. Death occurred sometime after 9:00 p.m. on Friday, June 26, 1992, the last time her father spoke to her, and 8:00 a.m. the next morning. After police accumulated substantial inculpatory facts

against him, White eventually admitted to being with Deibert, but he denied causing her death. He challenges the trial court's evidentiary rulings and the sufficiency of the evidence to convict him. We summarize the facts most favorable to the verdicts. *State v. Hage,* 532 N.W.2d 406, 408 (S.D.1995).

Toni Deibert's father had been waiting to see her all day on Sunday, June 28—it was his seventy-ninth birthday. At 9:15 p.m. he finally went to her home to check on her. He found the screen door unlocked, which was unusual, but the inner door was locked. After entering with his key, he noticed a family picture on the floor and dirty dishes in the kitchen sink. Her home had always been immaculate. A plaque that had been hanging on the wall, lay on the floor. In her upstairs bedroom, he found her body, partially nude, sprawled on the floor at the foot of her bed, her nightgown pushed up around her shoulders, a blouse covering her face. The bedroom was in disarray: the bedspread, sheet, fitted sheet, and pillows had been removed from the bed and were on the floor, some with blood stains. Part of the bedding covered the pillows. A yellow disposable lighter lay in the middle of her bare mattress. (The deceased was a non-smoker.) Clothes, including a white skirt with a blood stain and a dress still on a hanger, littered the floor. Items on a table and dresser had been knocked over. The telephone was disconnected and dismantled; the handset was under the bed. A damp blue skirt and flowered house coat were found rolled up under an end table at the foot of her bed. Curiously, a small stick was found wrapped in these clothes.

Deibert had been a devout Catholic. Following the loss of her son who was killed in a 1988 car accident, her religious faith only deepened. She attended Mass daily at Sacred Heart Church, belonged to a bible study group, and worked with the church evangelism team, going door to door to win souls. On the day her body was discovered investigators noticed a large amount of devotional materials in her home. Her pastor, Father Geditz, characterized her as a "good lady that would help others out. She was a holy lady." Deibert was known for her willingness to give counsel to her fellow FMC employees and others in need.

Suspicion focused on Defendant, Gary White, a married FMC employee, after Father Rader, a priest at Deibert's church, told authorities that an inebriated White had accosted him outside the church three weeks earlier, questioning him about Deibert, talking about how he was a friend of Deibert's deceased son, and claiming to have killed people in Vietnam. Aberdeen police interviewed Deibert's co-workers at the FMC plant. FMC employees reported how White over the past seven years routinely showed up uninvited at their homes at any hour of the day or night, usually intoxicated, sometimes ruminating about wartime experiences in Vietnam. (He never served there.) He usually succeeded in talking his way inside. On occasion, he would obtain entry even when no one was at home. For the most part these visits were harmless, but some women he visited found him intimidating. Deborah Breese, a recipient of several of White's surprise visits, once offered him a ride to get him out of her house. She told the jury that while he rode in the backseat of her car, he was "calling me horrible names. He was slamming his fist into the roof of my car, into the doors, kicking the back of my seat. Yelling and screaming in my ear." Six FMC employees testified at trial about his persistent unexpected visits and, in fact, a former plant manager testified he had reprimanded White on the matter and placed a memo about it in his file. Deibert was aware of White's well-known habit of uninvited visits.

Investigators interviewed White several times; each time his version of events contained new discrepancies. At first, he stated the only thing he knew about Deibert was that she worked at FMC in the office and that he may have spoken to her on the phone at work but would not have recognized her. Yet less than twenty-four hours before her death, he had been seen speaking to her at a work-related meeting. He had also attended her son's funeral and told others about how sad she looked. Furthermore, he worked with her at FMC from a time when the company had only a handful of employees.

Later White admitted knowing her, saying he lied because he was nervous about the "suspicious circumstances" surrounding Deibert's death. He also admitted to a detective that he recently lost his cigarette lighter. Investigators later learned White was reputed to carry a small twig, a "medicine stick."

Aberdeen police were able to piece together White's movements on June 26. Most of the evening he drank at various places. Sometime that night while in a taxi, White was in Deibert's neighborhood with a friend. He pointed in the general direction of Deibert's house and told the cab driver, "I know a woman down there." White drank at a bar until closing time at 2:00 a.m. He could not consistently account for his whereabouts after that time.

On July 28, 1992, an autopsy report revealed seminal fluid had been found in Deibert's vagina. DNA evidence linked the fluid to White, prompting him to later stipulate at trial to his presence in Deibert's home in the early hours of June 27 and to having had sexual intercourse with her that night. He claimed it was consensual. The experts agreed there was a "very high probability" that sexual intercourse, consensual or otherwise, caused her death. Though medical evidence established that sexual intercourse occurred while she was alive, Deibert's body had postmortem abrasions on the left side of her face, shoulder, neck, right groin area, and left knee. Two pathologists believed these abrasions could be consistent with someone positioning her body in an attempt at rectal or vaginal intercourse from behind.

On May 3, 1993 White was indicted by a Brown County Grand Jury on four counts: Count I, First Degree Murder (Felony Murder) in violation of SDCL 22–16–4, alleging he effected Deibert's death while perpetrating a rape; Count II, Second Degree Rape in violation of SDCL 22–22–1(2); Count III, First Degree Burglary in violation of SDCL 22–32–1; and alternatively, Count IV, Second Degree Burglary in violation of SDCL 22–32–3.

Prior to his trial for the Deibert homicide, White pleaded guilty to raping C.G., a sixty-three year-old woman. The State moved to admit evidence concerning this rape, as well as his uninvited visits to the homes of co-workers. By memorandum opinion incorporated into specific findings of fact and conclusions of law, the trial court found these prior acts admissible. Over White's objection, C.G. testified at trial how she was alone at home on July 17, 1992 (three weeks after Deibert's death), when a man she later identified as White knocked at her back door. He claimed he was out of gas and asked to use the telephone. She let him in. When she realized he was only pretending to use the phone, she ran out. He chased after her and she was able to get back inside and lock him out. He broke in, knocked her unconscious, then when she awoke he locked the door and ordered her into the living room. He told her he liked women in dresses and demanded she put one on. She refused. He ripped off her clothes. After removing the cushions from a couch and placing them on the floor, he had her cover them with a sheet because he did not want to get them dirty. He unsuccessfully attempted sex in several positions, including approaching her from behind: C.G. testified he "ordered me to get down on my knees. And I had to bend down with my chest and head on the floor." Then he had her lie on her back on the cushions where he raped her. She got dressed. Later, he made her undress again except for her shirt and had her lie back on the cushions to be raped again. Over the course of these violent acts he repeatedly threatened to kill her and her husband when the husband returned home. C.G. complied with his demands for an ashtray, water, and pop, but could not provide cigarettes because she did not smoke. When he appeared to have fallen asleep, she remained immobile, too afraid to use the phone to call for help or to attempt escape. An hour and a half after the ordeal began, he left.

White did not testify, but the theory his attorneys offered the jury was that White and Deibert had a sexual affair on the night she died. His attorneys emphasized that Deibert and White were acquainted with each other through work; they had been seen talking together at a work-related meeting earlier in the day; there was no forced entry into Deibert's home; no valuables were

taken; the blood stains could have occurred during sex; and medical experts agreed the ruptured aneurysm could have been triggered merely from the usual exertion of sexual intercourse. The State argued that all the circumstances signified a violent event and that a sexual liaison with White considering Deibert's religious convictions was highly improbable, especially as not one witness could connect White and Deibert outside of their infrequent contacts at work.

In closing arguments both sides conceded the jury's verdict would hinge on the question of consent: only if Deibert did not consent to sexual intercourse could White be held criminally responsible for her death. The jury returned verdicts of guilty of second degree rape, first degree burglary, and first degree murder. The circuit court sentenced White to mandatory life imprisonment for the murder, and twenty-five years each for rape and burglary. All sentences were to run concurrently. White appeals raising these issues:

I. Did the trial court abuse its discretion in admitting evidence regarding White's uninvited visits to the homes of co-workers?

II. Did the trial court abuse its discretion in admitting evidence of White's prior rape conviction?

III. Was the evidence sufficient to sustain convictions of rape, felony murder, and burglary?

IV. Was the sentence disproportionate, resulting in cruel and unusual punishment?

V. Was White prejudiced by prosecutorial misconduct?

## ANALYSIS

*I. Evidence of Uninvited Visits*

■ The trial court admitted testimony about White's repeated practice of visiting fellow employees unannounced pursuant to SDCL 19–12–5 (Rule 404(b)):

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as

proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

A court's evidentiary rulings will remain undisturbed absent an abuse of discretion. *State v. Hanson,* 456 N.W.2d 135, 138 (S.D. 1990); *State v. Bawdon,* 386 N.W.2d 484, 486 (S.D.1986); *State v. Means,* 363 N.W.2d 565, 568–69 (S.D.1985). White argues this evidence portrayed him as an unwholesome character, a pest and a drunk, but it had no value in establishing any common plan or scheme to commit rape. We note that SDCL 19–12–5 neither requires other acts be criminal nor even wrongful. *State v. Dace,* 333 N.W.2d 812, 816 (S.D.1983). The trial court admitted this evidence not to show White had a common plan to commit rape, but only to establish he had a seven year pattern for gaining entry into fellow employees' homes; it tended to explain how Deibert may have admitted White into her home for purposes other than consensual sex.

■ The question we must first address is whether this is permissible non-character usage of similar acts evidence. SDCL 19–12–4 (Rule 404(a)). Relevance is a precursor to admitting any evidence. SDCL 19–12–2 (Rule 402); *State v. McCord,* 505 N.W.2d 388, 392 (S.D.1993); *State v. Phillips,* 489 N.W.2d 613, 617 (S.D.1992). Testimony concerning White's routine of finding a way into fellow employees' homes was relevant to the State's theory of how he gained entry into Deibert's home and why she would have let him in believing his purpose to be innocuous. Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant. SDCL 19–12–1; *State v. McDonald,* 421 N.W.2d 492, 494 (S.D.1988). "Any fact that tends to connect an accused with the commission of a crime is relevant and has probative value." *State v. Johnson,* 316 N.W.2d 652, 654 (S.D.1982). White's pattern of surprise visits was so well established it constituted a plan pursuant to SDCL 19–12–5. "Plan" includes a common design or scheme. *State v. Champagne,* 422 N.W.2d 840, 842 (S.D.1988).

■ Once deemed relevant, the court determines whether the danger of unfair prejudice substantially outweighs the probative value of the evidence "in view of the availability of other means of proof" and the other factors under SDCL 19–12–3 (Rule 403). FRE Advisory Committee Note to FRE Rule 404(b); *State v. Basker*, 468 N.W.2d 413 (S.D.1991). The trial court balanced the probative value against the prejudicial effect stating:

> The probative value is high. The purported victim is dead. There are no other witnesses concerning the issue of the circumstances under which the [D]efendant was admitted to the decedent's home. There appears to be little prejudice to the Defendant as none of the other visits were for the purpose of unconsented sex.* The Defendant is further protected from prejudice by appropriate limiting instructions to the jury concerning the purpose of the evidence. Thus, the balancing test favors admissibility.

As part of its balancing of probative value against undue prejudice the court found that there was no other evidence on the circumstances surrounding White's admittance to Deibert's home. We agree; there was a substantial need to offer this evidence to address that issue. As his past visits to FMC employees were relatively harmless, it is highly probative that Deibert, who was known for giving advice to fellow employees and who was aware of White's uninvited visits to others, may have permitted him into her house in the middle of the night for purposes other than a sexual liaison. Furthermore, although incidents beginning seven years earlier may be considered remote the trial court noted that White's pattern was continual over the years. The court's admission of this evidence along with an appropriate limiting instruction, was not clearly against reason and evidence and, therefore,

was not an abuse of discretion. *State v. Harris*, 494 N.W.2d 619, 624 (S.D.1993).

## II. Evidence of Other Rape Conviction

Three weeks after Deibert's death, White raped C.G. White argues this incident should not have been disclosed to the jury. Conspicuous similarities parallel C.G.'s rape with the circumstances of Deibert's death: (a) Both women, ages 56 and 63, were close in age; (b) both were in their own homes when the incidents occurred; (c) C.G. was raped on couch cushions covered with a sheet; pillows covered by bedding were found on the floor next to Deibert's body; (d) in both cases intercourse occurred on the floor despite the availability of a bed; (e) evidence of attempted intercourse from behind existed in both cases; (f) White wanted C.G. to put on a dress; a dress on a hanger and other clothing were found on the floor of Deibert's bedroom; and (g) White gained entry to C.G.'s home through artifice; there was no evidence of forced entry into Deibert's home.

As noted earlier, SDCL 19–12–5 (Rule 404(b)) allows admission of other acts to prove common plan or scheme. In *State v. Willis*, 370 N.W.2d 193 (S.D.1985), the defendant, charged with raping a mentally retarded student, had sexual relations with another retarded student two days earlier. The acts of sexual intercourse in both cases were similar, thus the prior act had a direct bearing on his plan or design. *Id.* at 198.

■ Furthermore, White's rape of C.G. and her testimony about his peculiar acts and threats of violence buttresses an essential issue in this case—consent.

When appellant claims innocence, such as he does here, by a mitigating factor, namely, consent, he thus begets the establishment of intent as a material issue in the crime of rape. Therefore, we hold that an admission of "other acts evidence" to prove intent is not contingent on it being a spe-

---

\* During trial FMC employee, D.H., testified on direct examination about White's unannounced arrivals at her home twenty to thirty times. During cross-examination White's counsel attempted to get D.H. to admit having consensual sex with White. She denied it. On re-cross examination, defense counsel bluntly asked her if White ever

sexually assaulted her. She then responded to everyone's surprise that White had twice raped her during his uninvited visits. She never reported it because she was afraid. Randy Crawford, a friend of White, testified that White had admitted having sexual relations with D.H.

cific element of the crime charged, but is dependent on the establishment of intent as a material issue.

*Willis*, 370 N.W.2d at 198. C.G.'s detailed rendition of the events of her rape compares similarly with the scene at Deibert's bedroom. Such similarity establishes relevancy and is crucial to the issue of consent, especially because unlike the victim in *Willis* who could testify about the incident, Deibert could not. Only if sexual intercourse was nonconsensual could White be held responsible for the ruptured aneurysm that caused Deibert's death. Hence this evidence formed an integral part of the corpus delicti for homicide:

> No person can be convicted of murder ... unless the death of the person alleged to have been killed, and *the fact of the killing by the accused are each established as independent facts beyond a reasonable doubt.*

SDCL 22-16-2 (emphasis added). Also, if White's entry into Deibert's home was invited and his intent in entering or remaining was not unlawful, then no burglary occurred as well.

■■■■ If specific intent is an element of an offense, proof of similar acts may be admitted to carry the burden even if the defense to the charge is a complete denial. *State v. Ondricek,* 535 N.W.2d 872, 874 (S.D. 1995); *State v. Klein,* 444 N.W.2d 16, 19 (S.D.1989); *State v. Champagne,* 422 N.W.2d 840, 843 (S.D.1988); *State v. Means,* 363 N.W.2d 565, 568 (S.D.1985). Extrinsic evidence to establish intent is admissible for the prosecution to meet its burden of proof under a specific intent crime. *Champagne,* 422 N.W.2d at 844. If a rapist's method of operation is calculated to create the appearance of consent by the victim, similar acts evidence may be admitted to negate the defense of consent. *Oliphant v. Koehler,* 594 F.2d 547, 550–554 (6th Cir.1979).

Under like circumstances, other jurisdictions have allowed similar acts to prove intent, motive, common plan or design. *State v. Downing,* 109 Ariz. 456, 511 P.2d 638 (1973) (evidence accused kidnapped and raped woman two days after the kidnapping and rape presently charged held admissible to show plan or scheme based on similarities between the two incidents); *People v. James,* 62 Cal.App.3d 399, 132 Cal.Rptr. 888 (1976) (testimony accused attempted to rape another woman within two months after rape for which accused was prosecuted held admissible where rapes occurred in similar manner); *Payne v. State,* 233 Ga. 294, 210 S.E.2d 775 (1974) (testimony of two women that after rape for which he was charged, he attacked them in similar fashion, held admissible to show defendant's state of mind or intent); *People v. Berry,* 244 Ill.App.3d 14, 184 Ill. Dec. 534, 613 N.E.2d 1126 (1991) (evidence of sexual assault occurring three weeks after charged sexual assault was admissible as modus operandi based on similarities between the acts); *Henley v. State,* 519 N.E.2d 525 (Ind.1988) (testimony on two prior rapes admissible to show common plan or scheme where each rape occurred during daytime at each victim's home in same neighborhood); *State v. Morgan,* 207 Kan. 581, 485 P.2d 1371 (1971) (testimony of two women that they had been raped by accused, one occurring two years prior and other five months after the present offense, held admissible to show motive, intent, identity, guilty knowledge and plan); *State v. McRae,* 371 N.W.2d 66 (Minn. App.1985) (testimony accused raped woman two months after present charge, admitted as crimes were similar in time and modus operandi); *State v. Williams,* 205 Neb. 56, 287 N.W.2d 18 (1979) (evidence accused within seventy-two hours after rape and murder, raped another woman, then raped and murdered a third woman, held admissible to prove motive and intent); *State v. Reid,* 334 N.C. 551, 434 S.E.2d 193 (1993) (testimony accused raped woman within two days after current offense was admissible to show identity, motive and intent when acts were sufficiently similar in nature).

■■ White pleaded guilty to raping C.G., so the jury was not faced with the plight of having a trial within a trial with added issues of credibility to determine whether the purportedly similar act was actually committed. Yet the defense had a full opportunity to confront C.G. and cross-examine her to highlight circumstances dissimilar from Deibert's. Lastly, the trial court gave a limiting instruc-

tion to the jury both at the time of C.G.'s testimony and again with final instructions. SDCL 19–9–12. Balancing its highly probative value against its potentially prejudicial impact, admission of this evidence was not an abuse of discretion. *Harris,* 494 N.W.2d at 624.

### III. Sufficiency of Circumstantial Evidence

■■■ White contends the evidence was insufficient to convict him. The State's case against him was mostly circumstantial.

> The established rule in this state is that to warrant conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with each other and with guilt of the party charged, and such as cannot by any reasonable theory be true and the party charged be innocent.... This rule does not mean the evidence must be such as to exclude every possible hypothesis of innocence. Rather, it requires only the exclusion of reasonable hypothesis of innocence.

*State v. Esslinger,* 357 N.W.2d 525, 530–31 (S.D.1984) (citations omitted). The question is whether the jury was presented with facts consistent with each other and with White's guilt so as to exclude any reasonable theory of innocence. We focus on those facts dealing with consent, the fulcrum issue. Deibert had to have encountered White sometime after 2:00 a.m. when he ended a night of heavy drinking. She knew him from work and was aware of his usually harmless surprise visits while intoxicated. She had been receptive in the past to counseling fellow employees. Deibert's age, fastidiousness, religious devotion, the disordered condition of her bedroom, the disconnected phone, the abrasions on her body, White's dissimilar lifestyle, White's and Deibert's lack of close familiarity, and the remarkable similarities in C.G.'s rape and the scene of Deibert's death, considered together, rule out any rational theory that sexual intercourse was consensual. The jury was also entitled to take into account White's misleading statements to investigators as tending to show consciousness of wrongdoing. *Hage,* 532 N.W.2d at 411 (citing *Wilson v. United States,* 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896)). Medical testimony established that it was "very highly probable" that the sexual encounter caused the aneurysm to rupture, killing Deibert. The case against White was circumstantial, but we conclude that more than sufficient evidence was presented to the jury from which it could rule out any reasonable hypothesis of innocence and convict him of murder, burglary and rape.

### IV. Constitutionality of Sentences

■■■ Defense counsel made no objection during sentencing nor presented any data to support White's claim that his sentence was disproportionate. The imposed sentences are within statutory limits. White received the maximum sentence on all counts. Should any claimed error in sentencing exist, the trial court must be given an opportunity to correct it before we review it on appeal. *State v. Heftel,* 513 N.W.2d 397 (S.D.1994); *State v. Holt,* 334 N.W.2d 47 (S.D.1983). This was not done, consequently White's disproportionate punishment issue is not properly before us. *Heftel,* 513 N.W.2d at 401; *State v. Holter,* 340 N.W.2d 691, 692 (S.D. 1983).

### V. Prosecutorial Misconduct

■■■ White alleges he was prejudiced by prosecutorial misconduct when the State called a summer legal intern from its office to testify about White's enigmatic remark during a recess about one of the exhibits, the stick found wrapped in Deibert's clothing. The witness sat at counsel table while the jury was present, but before the witness was sworn, defense counsel objected and outside the presence of the jury, the trial court ruled the proffered testimony inadmissible. Nothing here approaches prosecutorial misconduct or prejudice to White.

Affirmed.

MILLER, C.J., and JAMES ANDERSON, Circuit Court Judge, concur.

SABERS and AMUNDSON, JJ., dissent.

GILBERTSON, J., was not a member of the Court at the time this case was submitted.

SABERS, Justice (dissenting).

I join Justice Amundson's dissent. The evidence of this later rape should have been excluded because the probative value *was substantially outweighed* by the danger of unfair prejudice. (SDCL 19–12–3 (Rule 403)). The unfair prejudice arising from the detailed evidence of this later rape is so overwhelming it makes any probative value minute by comparison. How can the defendant possibly get a fair trial on the charged act when these incredibly prejudicial details are so dominant in the mind of the jury? He simply can not. We should reverse and remand for a fair trial. *See* SDCL 19–12–3.

AMUNDSON, Justice (dissenting).

I part company with the majority opinion allowing admission of C.G.'s testimony regarding her rape by White three weeks after Deibert's death.

My point of contention rests with the balancing test of probative value versus unfair prejudice under SDCL 19–12–3 (Rule 403). In my opinion, if ever a case where the danger of testimony before a jury rose to the level of unfair prejudice outweighing probative value, this is it. *State v. Ondricek*, 535 N.W.2d 872, 873 (S.D.1995) (citing *State v. Steele*, 510 N.W.2d 661, 667 (S.D.1994)). Although no standard exists under South Dakota law delineating the point where unfair prejudice outweighs probative value, the majority in *Ondricek* stated:

[O]ur goal is "to avoid the introduction of extrinsic evidence which is likely to incite the jury to an irrational decision."

*Id.* at 878 (quoting *United States v. Williams*, 816 F.2d 1527, 1532 (11th Cir. 1987)). The court in *Williams* further provided:

[T]he standard we apply in determining when prejudice becomes unfair requires an assessment of the heinous nature of the extrinsic offenses. If the extrinsic offenses are of such a heinous nature that they are likely to sway the jury irrevocably to a

decision of guilt, then they must be excluded under rule 403.*

816 F.2d at 1532. *See also United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir.1993) (defining unfair prejudice as "a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence").

Addressing unfair prejudice, the Washington Supreme Court, in *State v. Coe*, 101 Wash.2d 772, 780–81, 684 P.2d 668, 673–74 (1984), held that it was error to admit Coe's sexually explicit writings as evidence against him in a rape trial. The court stated:

The evidence of Coe's sexually oriented writings was inflammatory on its face and carried with it a high probability of prejudice to his right to a fair trial. Careful consideration and weighing of both relevance and prejudice is particularly important in sex cases, where the potential for prejudice is at its highest. *State v. Saltarelli*, 98 Wash.2d 358, 363, 655 P.2d 697 (1982).

"One need not display an imposing list of statistics to indicate that community feelings everywhere are strong against sex offenders.... Once the accused has been characterized as a person of abnormal bent, driven by biological inclination [or anger], it seems relatively easy to arrive at the conclusion that he must be guilty, he could not help but be otherwise. When deciding the issue of guilt or innocence in sex cases, where prejudice has reached its loftiest peak, our courts ... [offer] scant attention to inherent possibilities of prejudice...."

*Coe*, 684 P.2d at 673–74 (quoting Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L.Rev. 325, 333–34 (1956)). The *Coe* court held the testimony both irrelevant and unduly prejudicial.

This court stated in *Steele*, 510 N.W.2d at 667, that trial courts must be "ever vigilant" when considering this type of evidence. Vigilance should also be exercised in the appel-

---

* The Advisory Committee's note on Fed.R.Evid. 403 provides in part as follows: " 'Unfair prejudice' ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R.Evid. 403 advisory committee's note *reprinted in* 5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence app. at 512 (1994).

late area. Does evidence regarding another rape with alleged threats to kill the victim and her husband (which there is no evidence of in the Deibert case) invite consideration of facts by the fact-finder, which appeal to making a decision based on emotion or allowing persuasion by illegitimate means?

I submit the answer in this case is yes. In closing argument, the prosecution argued basically that what White had done in the C.G. case, he also did in this case. This evidence was clearly used to show White had the propensity to do this type of act and was a bad person. White arguably could fall within the definition of a bad person, but that fact alone does not merit disregarding appropri-ate application of the rules of evidence to his case. SDCL 19–12–5 prohibits the admission of evidence to prove bad character to argue since White did it before, he also did it here. If this evidence is not unfairly prejudicial, I cannot believe there will ever be a set of facts where prejudice could possibly tip the scale against probative value.