**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Julie JAEB, a/k/a Julie Hunger, Defendant and Appellant.**

**No. 16309.**

Supreme Court of South Dakota.

Considered on Briefs April 27, 1989.

Decided June 21, 1989.

Roger A. Tellinghuisen, Atty. Gen., Janine M. Kern, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Michael "Mick" Strain, White River, for defendant and appellant.

HENDERSON, Justice.

### CASE SUMMARY

This criminal appeal presents a singular issue: Was Defendant Julie Jaeb, a/k/a Julie Hunger, here referred to as Julie, denied due process through impermissibly suggestive pretrial identifications by the victim, Andy Sabers (Andy), and an in-court identification? We hold that she was not and affirm convictions of second-degree burglary, aggravated assault, and attempted first-degree murder. A McCook County jury found her guilty. She received a fifteen year prison sentence for each of the burglary and assault convictions and a twenty-five year sentence on the attempted murder conviction. All sentences were to be served concurrently. We affirm.

### FACTS

This case resulted after Andy Sabers (Andy) told his son Earl, Samantha Saber's father, that he kept large sums of money in his apartment in Salem, South Dakota. Sa-

mantha learned of the money. On September 6, 1987, Samantha and Julie checked into a motel in Salem, having traveled from Mission. This was substantiated by a credit card slip reflecting payment by "Julie Hunger" (she lives with Brad Hunger, in Mission). The next morning, September 7, 1987, Julie and Samantha went to a gas station in Salem, to inquire about getting a tire fixed. Informed that the job could not be done immediately, the pair set off in the direction of Andy's apartment.

Sometime between 11 a.m. and noon, Andy was visited by a woman whom he later identified as Julie. According to Andy, she claimed to be a representative of the Veterans Administration. She told him that she needed to use the bathroom because she had drunk a lot of coffee. He allowed her to do so, after which she came out, talked with him briefly, and again returned to the bathroom ostensibly because of "too much coffee". Julie made a point of closing the bathroom door so loudly that he could hear it (Andy is hard of hearing and, apparently, very nearsighted). Andy was facing away from his bathroom most of the time, and the inference is that she was not, in fact, in the bathroom when he thought she was. In any event, Andy later missed $1,006 which had been hidden in two wallets kept in a jacket in his closet. Andy recalled the exact amount because he was quite proud of $2 bills, which made up the $6 in $1,006. Andy did not report this incident to the police, but did mention the theft to his son, later, before a second incident which occurred during the night of September 18–19, 1987.

The next incident was presaged by a telephone call Andy received during the afternoon of September 18, 1987. Andy testified that the call was from the same woman who visited him on September 7. She informed him that she was coming again. Billing records of a telephone at the residence of Brad Hunger and Julie, maintained in Brad's mother's name, indicate that a call was made from the Hunger trailer in Mission to Andy's apartment in Salem that same afternoon. Brad and his mother denied making the call.

In the early afternoon of September 18, according to State's witness, Bill Antoine, Julie and her two children traveled with Antoine from Mission to Salem and then met Samantha. The group journeyed in a silver Mercury, driven by Julie, who was stopped for speeding 150 miles east of Mission, while heading eastwards toward Salem. The ticket was marked 4:32 p.m. On arrival in Salem, the group picked up Samantha and left for Mitchell, South Dakota. During this trip, Julie and Samantha discussed duplication of a stolen key to Andy's apartment. The key was copied in Mitchell, after which the group returned to Salem. Samantha left for a party, in the company of one Billy Westhoff. Later that evening, while returning from the party, Samantha told Westhoff that "they were going to do something drastic," and asked him to lie about her whereabouts that night. Samantha, Julie, and her children were then driven by Antoine to the vicinity of Andy's apartment. Antoine and the children waited in the car.

Antoine testified that Samantha and Julie came back fifteen minutes later in an agitated state, and said something to the effect that they had not found what they were looking for and had awakened Andy. After another abortive sally to Andy's apartment, Samantha said "He's got to go. He seen us." This matches Andy's testimony that he had been awakened by a woman in his room, went to the front window, and looked out.

Events then accelerated. Antoine overheard Samantha and Julie plan Andy's killing. After collaborating, they settled on a tire iron for a weapon, per Antoine. Antoine let Julie off near Andy's home and cruised around. A police officer saw the Mercury on Main Street at 2:30 a.m. Later, the group met Julie, whereupon she related that she kept hitting Andy, and there was "blood all over." On the next day, Antoine pitched a tire iron and telephone cord out of the car. Some of Julie's clothing was later abandoned, partly burned, in Mission.

Meanwhile, according to Andy's testimony, Julie had lured him into letting her into

his apartment. Julie, whom Andy mistook for Samantha, had tapped on his window and told him, when he looked out, that his son had suffered a heart attack. Once inside, the intruder, then recognized by Andy to be his erstwhile V.A. visitor, disabled the phone by removing a cord. She then attacked him with a metal rod (similar to a tire iron), beating him around the head. At one point, he briefly lost consciousness, but revived. Julie, by Andy's testimony, actually stopped at one point and asked him if he wanted a towel to wipe off the blood. Julie, when asked by Andy to call the police, pretended to make a call, though the phone was inoperable by then. She eventually left, leaving him with a warning that her husband would come in and shoot him if he cried out.

Andy stumbled to a neighbor's apartment and secured help. He had multiple lacerations of which five required stitches. Exhibits, introduced in evidence, now reviewed by this Court, reveal Andy's head beaten into a bloody mess, with many deep wounds. Any of the blows, according to medical expert testimony, could have been fatal.

## DECISION

Julie alleges that she was denied due process in that impermissibly suggestive identification techniques were used. Associated with this is heavy emphasis on inconsistencies in various statements Andy made at different times. We disagree.

The inconsistencies are, to a great extent, based on confusion which seems to have been created by a police officer's question asking Andy if his assailant was "black or white." Both Andy and the officer, Jim Hoiten, made reference to the wording of the question in that manner. Andy answered Hoiten's question by saying that the attacker was white.[1] This questioning also occurred in the immediate aftermath of Andy's beating, during which he lost a considerable amount of blood. Andy's description of Julie, aside from col-

or confusion, was reasonably accurate. He described her as of stocky build, about 5 feet tall, round faced. Andy, on September 22, 1987, added another detail: "Brown tone" hair. This is consistent with a photograph of Julie later used in a five-photo lineup, from which Andy picked out Julie with no difficulty. The racial inconsistency challenge to Andy's identification is, on these facts, unconvincing.

■ Eyewitness identification law is well developed. The issue is whether an identification procedure in the "totality of the circumstances" "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967). In-court identifications are not admissible at trial when they stem from a photographic identification procedure "so unpermissibly suggestive as to result in a very substantial likelihood of irreparable misidentification." *State v. Iron Thunder*, 272 N.W.2d 299, 301 (S.D.1978) (citing *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).

However, even though the photographic lineup may be considered to be impermissibly suggestive, the in-court identification is admissible upon the state's showing, by clear and convincing proof, that the in-court identification had an independent origin, i.e., based upon observation of the suspect by the witness other than the photographs shown to the witness. *Iron Thunder*, at 301. There is, thus, a two-stage inquiry: 1) Was the lineup identification impermissibly suggestive? 2) Did the witness/victim's in-court identification have an independent origin? *Iron Thunder, id.; State v. Esslinger*, 357 N.W.2d 525, 528 (S.D.1984). This rule has evolved into a question of "not merely was the procedure suggestive, but whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive."

1. As the trial court noted during the hearing on Julie's motion for a lineup, if the judge had been asked that question, he would respond the same way. Julie's ethnic extraction is not immediately clear from visual evidence alone, although she is, in fact, part Native American (Indian).

*State v. Phinney,* 348 N.W.2d 466, 468 (S.D.1984). Reliability of identification is determined according to five factors gleaned from *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972):

1) Length of time between crime and confrontation;

2) Opportunity of the witness to observe the accused at the time in question;

3) Level of certainty exhibited;

4) Witness' degree of attention; and

5) Accuracy of prior description.

These factors were recently applied in *State v. Stuck,* 434 N.W.2d 43 (S.D.1988), a case in which the victim of a near-fatal stabbing was held to have reliably identified his assailant after observing him over a period of five minutes, much of which time he was engaged in a telephone conversation. Like Andy in this case, the victim in *Stuck* had sight deficiencies (blind in one eye in *Stuck;* here, very nearsighted), and gave an imperfect description of his attacker to police while suffering from a near-fatal loss of blood. *See Stuck,* at 53. Here, where Julie visited Andy on at least two different occasions, once in daylight and once at night, and both times engaged him in conversation within his own apartment, Andy's in-court identification cannot be held to be lacking in independent origin. Andy's descriptions of Julie were, aside from the racial mixup (which might well have developed from rather clumsy questioning by the police), consistent. Despite Andy's use of "if it's anybody . . . ," which appears to be merely a phrase he uses, his identifications were very certain.

Julie attacks Andy's two pretrial identifications: 1) A five-photo array shown to him in a hospital room on September 24, 1987, five days after the attack; and 2) a six-woman lineup held at the Minnehaha County Jail on October 2, 1987. These are considered separately below, after review of the photo-array and video-taped lineup by this Court.[2]

■ The photographic lineup consisted of five vertically mounted pictures of rela-

tively young-looking women. All had dark hair. Three of the women were of Native American descent, including Julie. Two seem relatively thin-faced. Three are round-faced, including Julie. Three of the five, including Julie, appear of stocky build. Keeping in mind that Andy had described his attacker as brown haired, stocky, and round-faced, this grouping does not unfairly emphasize this defendant. Julie seems more darkly complected than three of the women, but is not definitively Native–American in appearance.

■ After examination of the video-taped of the live lineup, we deem it to be very fair. All of the women depicted were of Native American ancestry, and darkly complected. All were stocky in body structure, although one, not Julie, was taller than the others. The video-tape, when viewed, expunges any credence in Julie's arguments that it was suggestive. She cannot argue that the photo-lineup was unfair because it contained Caucasians, and then complain that the video-taped lineup was unfair because it was composed of Native Americans, who, in fact, were all similar to Julie in build and complexion.

These pretrial identifications were not deprivations of due process. The case most favorable to Julie's argument is *Arriola v. State,* 520 P.2d 690 (Okl.Cr.1973), where the Guamanian/Oriental defendant was the only Oriental in a lineup, and had been described to the witness as Oriental. This case is obviously distinguishable. Andy saw his assailant on several occasions, in good light, whereas the witness in *Arriola* had a single very brief encounter in the dark. Three of the five photographs were of Native Americans in this case. Nor is this case comparable to *Lablanc v. People,* 177 Colo. 250, 493 P.2d 1089 (1972), wherein only the defendant was clothed in jail garb. Clothing, here, is not a factor. Nor did Andy fail to identify Julie when asked, except initially in court, when distance and lighting (the record contains Andy's references to lack of light on two different occasions) defeated him. When

2. These exhibits are on file as part of this case      record.

moved closer, he definitely identified Julie as the coffee drinker, a reference to his first encounter with her.

We conclude that there were no due process violations through impermissibly suggestive pretrial identifications and in-court identification. Accordingly, we affirm all convictions and resulting sentences.

WUEST, C.J., MORGAN and MILLER, JJ., and GILBERTSON, Circuit Judge, concur.

GILBERTSON, Circuit Judge, sitting for SABERS, J., disqualified.