STATE of South Dakota, Plaintiff
and Appellee,

v.

John Martin McCORD, Defendant
and Appellant.

No. 18097.

Supreme Court of South Dakota.

Considered on Briefs April 20, 1993.

Decided Aug. 25, 1993.

Mark Barnett, Atty. Gen., Charles D. McGuigan, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Patrick M. Schroeder, Minnehaha County Public Defender's Office, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

*PROCEDURAL HISTORY/ISSUE*

On October 31, 1991, a Minnehaha County Grand Jury indicted John McCord (McCord) for First Degree Robbery. Thereafter, State additionally filed a Part II Information alleging McCord to be a habitual offender. Following a three-day trial ending on June 11, 1992, a Second Judicial Circuit jury returned a guilty verdict for First Degree Robbery. After a second arraignment on July 7, 1992, McCord admitted to the Part II Information. On August 28, 1992, McCord received a 50-year sentence with 40 years suspended upon condition that he violate no laws and be on good behavior following his release. By appeal filed October 14, 1992, McCord raises the following issue:

> Did the trial court err by admitting into evidence two overlays prepared by a composite sketch artist which significantly altered the appearance of the original composite sketch of the robbery suspect?

Based upon the totality of the circumstances, we affirm.

## FACTS

Shortly after 3:00 p.m. on October 19, 1991, while working behind the counter at the Renner Corner Store in Renner, South Dakota, Janice Reimnitz was approached by a male customer who had been playing video lottery. Apparently frustrated by his lack of winnings, he demanded the money from the register. Reimnitz complied by only giving him one and five dollar bills. Before Reimnitz handed over the larger denominations, a car pulled into the parking lot causing the robber to flee with these ones and fives and a six-pack of beer in hand. When the driver of the car, Laura Everson, came in the store, Reimnitz relayed what had happened and called the police.

After describing the man to law enforcement officers, Reimnitz then worked with Deputy Phil Toft of the Minnehaha County Sheriff's Department to develop a composite sketch of the robber whom she described as a white male, 5'4" tall, blond medium length hair, gold wire-rimmed glasses, blue-checked shirt with a white t-shirt and blue jeans. She also noted that a tan "smaller to intermediate size car" had been parked on the north side of the building while this man had been in her store. A completed drawing was published in the local newspaper and distributed to police.

Mike Eggers, another store employee who left the store just prior to the robbery, was unable to describe the person who had been playing video lottery, but did recall seeing a cream-colored Volkswagen Rabbit parked at the store when he left. Laura Everson's description of the fleeing man somewhat varied from Reimnitz's version. Although she did not describe any facial hair or scars, she thought she saw a green Omni parked in the lot.

Through investigation and tips, police learned that a man with a large number of one dollar bills had been playing video lottery at the Little Coalinga Bar in Sioux Falls sometime after four o'clock that same day. After exchanging over 150 ones, which he claimed to have won gambling, for larger denomination bills, he called for a cab. Cab driver David Renes picked up a fare at Little Coalinga between 4:20 and 4:30 p.m. that day and took him to 503 North Indiana for a brief moment, to Northern Plains Seed Company for five to ten minutes, then to the Westside Casino where the customer threw approximately 40 ones on the back seat as payment for the $17.60 fare. The man asked for Renes' cab number so he could request the same cab later. After about two hours, Renes picked up the same man at Westside, drove him to the alley behind 503 North Indiana, and then back to Little Coalinga. Renes later drove this man to the Crow Bar, then eventually to the Baltic Corner. Except for the round trip to the Baltic Corner, all fares had been paid with one dollar bills.

After viewing a six-photograph line-up prepared by Deputy Steve Wagner, Renes and two Little Coalinga employees who previously encountered the suspect, identified the photo of John McCord as the man with the abundance of one dollar bills. Although Eggers and Everson could neither confirm nor deny that the man at Renner Corner was in the line-up, Reimnitz did select the photo of McCord. However, McCord's photo showed a man with mustache, sideburns, scar, a dimple on the chin, and a receding hairline—characteristics not contained in the composite drawing. On the other hand, McCord, an employee of Northern Plains Seed, resides at 503 North Indiana with his mother who owns a tan Volkswagen Rabbit.

At trial, McCord's mother testified that on October 19, while she used another son's vehicle for a shopping excursion, McCord remained at home to repair the Rabbit which had a habit of stalling. A neighbor confirmed that he had seen McCord working on the car that same morning. On October 22, 1991, the car was repaired at Sioux Falls Auto Service.

Christina Grillas, an acquaintance of McCord and his mother, claimed that she was at the McCord house at 3:00 p.m. (the time of the robbery) and spoke to McCord. Another alibi was supplied by McCord's brother, James, who claimed that, immediately after receiving his scheduled 3:00 medicine at the VA Hospital, he made a phone

call to McCord. Although VA hospital records indicated that James did not receive any medicine around that time, a nurse conceded that mistakes do occur.

Called as an expert in identification, Deputy Toft explained differences and similarities between McCord and the description given to the police. Part of his testimony included drawing a mustache and hairstyle similar to McCord's and placing these "overlays" on the composite sketch as a way to show how the suspect/drawing would look had Reimnitz described such characteristics.

Testifying on his own behalf, McCord asserted that he had not been to Renner Corner on October 19 nor did he rob the store. He further claimed that he had attempted to drive the car to his boss' home for assistance concerning the car's repairs, but the car stalled after going a few blocks. Supposedly, he pushed the tan Rabbit into a nearby McDonald's parking lot, then walked across the street to the Little Coalinga bar where he played video lottery and drank several beers. After about 30 to 45 minutes, he left and pushed the car home, arriving shortly before 3:00, where he drank a couple more beers. Although he recalled the phone call from his brother, James, he did not remember Grillas' visit.

Sometime after talking to James and taking a bath, McCord called a cab to take him back to Little Coalinga. (He had told Deputy Wagner that he had walked to the bar.) He admitted to possessing a large number of one dollar bills and may have boasted that the money was gambling proceeds, but claimed that he was in the habit of secretly keeping a large stash of ones as petty cash for fishing and drinking. His brother had previously testified that he was familiar with McCord's practice of storing away ones because he does the same. McCord did not testify about any other establishments he was alleged to have visited that day.

After three days of trial, the jury returned a verdict of guilty of First Degree Robbery. Obviously, the jury did not believe McCord's story. This appeal, focused on Deputy Toft's expert testimony, followed.

## DECISION

McCord asserts four reasons justifying his claim that the trial court abused its discretion in admitting the overlays into evidence: Improper expert testimony, irrelevant, prejudicial, and improper vouching and bolstering of the eyewitness' credibility. We shall address each reason seriatim.

### A. Expert testimony was admissible.

We have long acknowledged that the trial court has broad discretion concerning the admission of expert testimony, and its decision on that matter shall be reversed only upon an abuse of that discretion. *State v. Burtzlaff*, 493 N.W.2d 1 (S.D.1992); *State v. Hill*, 463 N.W.2d 674, 676 (S.D.1990). A determining factor in admitting such testimony is: Would it assist the trier of fact in understanding matters that normally would not be within a layperson's breadth of knowledge? *Hill* at 677; *State v. Swallow*, 350 N.W.2d 606 (S.D.1984). Certainly, jurors have some experience and common sense knowledge of factors that may cause occasional mistakes in identification; however, they do not possess an expert's comprehensive training in assessing the reliability of identification. *Hill* at 677.

Prior to trial, McCord was on notice that State intended to use Deputy Toft to explain the identification process and to note similarities and differences between the composite drawing and the mug shot used in the photo lineup. As laymen do not possess the skill and experience to assess an eyewitness identification, the trial court is proper in allowing such expert testimony provided it does not invade the province of the jury. *State v. Werner*, 482 N.W.2d 286 (S.D.1992); *State v. Huber* 356 N.W.2d 468 (S.D.1984). Toft's testimony in no way answered the ultimate issue; it merely informed the jury as to why an eyewitness may not give a completely accurate description. We find Connecticut to be persuasive on this issue in holding that a police sketch artist is

permitted to give his opinion with respect to the similarities and dissimilarities of the facial features of the person depicted in the composite sketch and the defendant's photograph, and to give a similar opinion

with respect to the composite sketch and the defendant in the courtroom. *State v. Palmer,* 491 A.2d 1075, 1080 (Conn. 1985). "The value of [Toft's] testimony is that it taught the jury how to view the materials before them by focusing their attention on the relationship of certain facial features." *Palmer* at 1081. Toft was not asked if McCord was the person in the sketch, nor did he ever testify so. Permitting helpful technical testimony concerning the science of identification was not an abuse of the trial court's discretion nor did it invade the province of the jury. *See United States v. Fosher,* 590 F.2d 381 (1st Cir.1979).

### B. *Testimony was relevant.*

■ Although Toft is qualified as an expert, McCord asserts that Toft's comparison testimony and use of overlays were irrelevant and therefore, inadmissible under SDCL 19–12–2. As noted earlier, Toft testified with expertise on similarities and differences in facial identification, emphasizing how and why eyewitness descriptions of suspects can be inaccurate, especially concerning facial hair. Relevance is the precursor to the admittance of any evidence. *State v. Phillips,* 489 N.W.2d 613, 617 (S.D.1992); *State v. Grooms,* 399 N.W.2d 358, 361 (S.D. 1987), *rev'd on other grounds,* 923 F.2d 88 (8th Cir.1991). Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant. SDCL 19–12–1; *State v. McDonald,* 421 N.W.2d 492, 494 (S.D.1988).

After testifying that people generally miss facial hair and other features, Toft placed overlays of a mustache and hairline similar to McCord's on the composite drawing to show how the suspect would look had Reimnitz described such characteristics. *At no time, however, did Toft testify or insinuate that McCord was the person depicted in the composite sketch.* Granted, the mustache and hair were drawn to look like McCord's, but we observe that all other properties of the sketch remained the same and that the jury was fully aware, per instruction, that the overlays were for comparative purposes only.

■ Deputy Toft's comparison testimony was clearly relevant concerning the testimony identifying McCord as having been at the robbery scene. We rely on the Connecticut authority cited earlier herein to support the relevance of the comparison evidence as a whole. As to the specific use of the overlays, they were relevant to Toft's position concerning the significant differences and similarities between the sketch and the photograph. Any evidence that tends to connect McCord to the offense charged is thus relevant. *State v. Brings Plenty,* 459 N.W.2d 390, 398 (S.D.1990). We, therefore, find that the trial court did not abuse its discretion in finding this testimony as relevant.

### C. *Probative value outweighed prejudice.*

■ Although evidence is deemed relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Such determination by the trial court will not be disturbed absent an abuse of discretion. *Grooms* at 361; *State v. Means,* 363 N.W.2d 565, 68–69 (S.D.1985); SDCL 19–12–3.

During a hearing outside the jury's presence, Judge Hurd stated that although he would permit the use of the overlays, he could not permit the jury to conclude that the composite drawing with the overlays is what the victim saw because the victim did not describe the suspect that way. Immediately prior to Deputy Toft taking the stand, Judge Hurd explained the limited purpose of the overlays to the jury:

I am receiving this evidence, however, for a limited purpose. And that limited purpose is this: You may consider and give it such weight as you deem it deserves in support of the officer's testimony as to those parts of the drawing, Exhibit 19, which are significantly similar to or significantly different from Exhibit 18, the photograph. And I am cautioning you in that regard that the overlays were not contributed by the alleged eye-witness in this case, the victim. These overlays came from the skill of the police artist and the photograph and not from the victim. And the best that the victim was able to do

during the process creating Exhibit 19 is Exhibit 19 itself.

Thus, the jury was informed that the overlays had no connection to the Reimnitz's description. This warning may have been unnecessary. "[I]t is necessary neither to instruct the jury that they should receive certain identification testimony with caution, nor to suggest to them the inherent unreliability of certain eyewitness identification." *United States v. Amaral,* 488 F.2d 1148, 1151 (9th Cir.1973); *United States v. Barber,* 442 F.2d 517, 526 (3rd Cir.1971), *cert. denied,* 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971).

■ Despite the precautionary instructions, McCord claims that the trial court, in effect, permitted Deputy Toft to make the drawing look more like McCord, thus prejudicing him. According to McCord's brief, the "overlays could only lead to confusion to the jury on what exactly the eyewitnesses saw and who exactly the eyewitnesses described."

■ Had the use of the overlays and composite drawing been the only identification evidence, this Court might tend to agree. We disagree, however, as the evidence strongly suggests otherwise. We determine if the identification procedure in the "totality of the circumstances" "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [McCord] was denied due process of law." *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *State v. Jaeb,* 442 N.W.2d 463 (S.D. 1989). *See Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Phinney,* 348 N.W.2d 466 (S.D.1984). Recall, two days after the robbery, Reimnitz viewed a photograph lineup and confirmed that the man in photograph # 5 (McCord) was the culprit. Three other people had previously selected McCord's photo from that lineup as the man with the abundance of one dollar bills. Each lineup was preceded by the following statement:

You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not obliged to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss this case with other witnesses nor indicate in any way that you have identified someone.

Reimnitz was plainly aware that the culprit might not be in the lineup. Despite her previous description, she chose a photo of a man with a mustache and receding hairline—the same photo that three other people had previously chosen. All four witnesses further identified the defendant in the courtroom—mustache, hairline, and scar all present—as the man they encountered on October 19, 1991. All of this information identifying McCord was elicited prior to Toft being called to the stand.

■ Prejudicial error is error which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it. *Phillips* at 617; *State v. Michalek,* 407 N.W.2d 815, 818 (S.D.1987). Though Reimnitz did not select McCord based upon any alleged prejudicial overlays, she did identify him as the robber in an independent line-up two days after the crime. It is this fact that is most compelling. In light of all the evidence presented prior to Toft's use of the overlays, we hold that use of the overlays was not prejudicial.

■ Evidence which has any tendency to prove any material fact has rational probative value. *Amaral* at 112. The balancing of the probative value of the tendered expert testimony against its prejudicial effect is committed to the broad discretion of the trial judge whose actions will not be disturbed unless there has been abuse of discretion. *State v. McDowell,* 391 N.W.2d 661, 666 (S.D. 1986); *State v. McNamara,* 325 N.W.2d 288, 291 (S.D.1982).

In *United States v. De Sisto,* 329 F.2d 929 (2d Cir.1964), *cert. denied,* 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), although a hijacking victim contradicted himself concerning the absence or presence of prominent tatoos on the accused's arms, the victim, prior to trial, picked the suspect out of a lineup with the latter's tatoos in full view,

and thereafter made a positive identification before the grand jury, at the first trial, and on other occasions. Judge Friendly found the jury to be "superbly equipped" to evaluate the impact of the evidence which "warranted a variety of inferences that would sustain [the victim's] identification and discredit his doubts." *Id.* at 934.

■ Upon review, especially concerning all identification testimony, we likewise find the jury to be "superbly equipped" to sift through any confusion sensed by McCord. It is well-known, and this jury was so instructed, that the jury is not bound to accept expert or authoritative opinion testimony and may disregard it if they so choose. *State v. Baker*, 440 N.W.2d 284, 287 (S.D.1989); *State v. Swallow*, 350 N.W.2d 606, 609 (S.D.1984). Whereas, no abuse of discretion occurred, we hold there was no unfair prejudice in the use of the overlays. *State v. Smith*, 458 N.W.2d 779, 784 (S.D.1990).

D. *Expert did not vouch for the witness' credibility.*

■ A "witness may not testify as to another witness' credibility or truth-telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness." *State v. Floody*, 481 N.W.2d 242, 249 (S.D. 1992). Thus, we consider if Deputy Toft's testimony was a direct commentary on Reimnitz's credibility.

■ McCord stands by *State v. Goodroad*, 455 N.W.2d 591 (S.D.1990), as precedent. There, this Court addressed vouching and bolstering by a law enforcement officer who testified that another witness had promised, pursuant to a plea bargain, to testify truthfully or face prosecution for "all the drug deals he's admitted" if he lied. We predicated that such testimony constituted reversible error due to the following:

The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecution is forcing the truth from his witness and the unspoken message is that the prosecution

knows what the truth is and is assuring its revelation.

Conveying this message explicitly is improper vouching. *Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 323, 2 L.Ed.2d 321 (1958)[.] We conclude that conveying it by implication is equally improper. . . .

The prosecutor may not tell the jury that the government has confirmed a witness' credibility before using him. [Citation omitted.] He should be no more able to indicate that the government has taken steps to compel the witness to be truthful. Both of these arguments involve improper vouching because they invite the jury to rely on the government's assessment that the witness is testifying truthfully.

*Goodroad* at 594; *United States v. Roberts*, 618 F.2d 530, 536 (9th Cir.1980). At trial, the witness takes an oath to be truthful. In order to find reversible error based on grounds of improper vouching, there must be additional improper insinuations for truthfulness. *Goodroad* at 594–595; *State v. Chakouian*, 537 A.2d 409, 412 (R.I.1988). Toft did not testify as to Reimnitz's capacity for truthfulness and no allegation of government incentives or threats has been shown. No improper bolstering or vouching occurred here.

■ Our legal system places primary reliance for the ascertainment of truth on the "test of cross-examination." *De Sisto* at 934. It is the responsibility of counsel during cross-examination to inquire into a witness' opportunity for observation, capacity for observation, attention and intent and distraction or division of attention. *Amaral* at 1153. McCord had ample opportunity to impeach Reimnitz's conflicting descriptions and Toft's use of the overlays.

■ We have upheld other convictions where a witness gave an imperfect description of a suspect to the police, yet later identified the defendant as the culprit. *See State v. Jaeb*, 442 N.W.2d 463 (S.D.1989); *State v. Stuck*, 434 N.W.2d 43 (S.D.1988). As it is a function of the jury to determine the credibility of witnesses, the jury is entitled to accept one witness' version of the facts and reject another's. *State v. Fox*, 313 N.W.2d

38 (S.D.1981). McCord's unsubstantiated claims of injustice are overwhelmed by the abundance of admissible evidence against him.

Affirmed.

MILLER, C.J., and WUEST, SABERS and AMUNDSON, JJ., concur.